UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GREGGY SORIO,

                Petitioner,

    v.

LAURA HERMOSILLO, Seattle Field
Office Director, Enforcement and Removal
Operations, United States Immigration and
Customs Enforcement (ICE), et al.,

                Respondents.

CASE NO. 2:25-cv-02492-TL

ORDER ON PETITION FOR
HABEAS CORPUS

This matter is before the Court on Petitioner Greggy Sorio's Petition for Habeas Corpus ("habeas petition"). Dkt. No. 1. Respondents are Laura Hermosillo, Seattle Field Office Director, Enforcement and Removal Operations ("ERO"), United States Immigration and Customs Enforcement ("ICE"); Bruce Scott, Warden, Northwest ICE Processing Center ("NWIPC"); Kristi Noem, Secretary, United States Department of Homeland Security ("DHS"); Pamela Bondi, United States Attorney General; and DHS. Having considered the motion, Respondents'

1   return[1] (Dkt. No. 22), Petitioner's traverse (Dkt. No. 24), and the relevant record, the Court

2   GRANTS the petition and ORDERS Petitioner's release.

3                                I.    BACKGROUND

4        Petitioner entered the United States as a lawful permanent resident in 2007 but was

5   apprehended by ICE in March 2025 following his release from criminal incarceration. Dkt. No. 1

6   ¶¶ 20, 22. He remains detained at the Northwest ICE Processing Center. *Id.* ¶ 24.

7   **A.    Petitioner's Physical Deterioration at NWIPC**

8        Petitioner alleges, and Respondents do not dispute, that he was in good health when he

9   entered ICE detention. *See* Dkt. No. I-9 (DHS Form I-213) at 2 ("The subject claims good

10  health"). Eighth months later, hospital records show that Petitioner's health has declined to

11  include two partial foot amputations, a diagnosis of ulcerative colitis (a type of inflammatory

12  bowel disease ("IBD")),[2] acute blood loss anemia, a kidney injury, a severe vitamin D deficiency

13  and dramatic unintended weight loss. Dkt. No. 16 at 3.

14       **1.    Gastrointestinal Issues**

15       Petitioner declares that on or about July 25, 2025, he began experiencing "severe

16  abdominal pain, yellowing of [his] skin, and bright red blood in [his] stool." Dkt. No. 17 (Sorio

17  Decl.) at 2. ICE Health Services Corps ("IHSC") physician and clinic director Dr. Eddie Wang

18  confirms that IHSC records show that "Petitioner reported to provider due to diarrhea,

19  //

20  //

---

[1] As used in this order, the term "Respondents" includes all Respondents except Respondent Scott. Respondent Scott has not responded to the habeas petition and has not appeared in this case.

[2] Inflammatory bowel disease, also called IBD, is an umbrella term for a group of conditions that cause swelling and inflammation of the tissues in the digestive tract. Ulcerative colitis, one of the most common types of IBD, involves inflammation and ulcers along the lining of the colon and rectum. Symptoms usually include belly pain, diarrhea, rectal bleeding, extreme tiredness and weight loss. Ulcerative colitis can lead to disability and life-threatening complications. *Inflammatory Bowel Disease (IBD)*, Mayo Clinic (Dec 18, 2024), https://www.mayoclinic.org/diseases-conditions/inflammatory-bowel-disease/symptoms-causes/syc-20353315 [https://perma.cc/AR75-7BMD].

sometime[s] noting blood" on July 24, 2025.[3] Over the next few months, Petitioner attests that he reported these symptoms to the NWIPC medical providers seven or eight times, requesting from the beginning to be sent to the hospital. Dkt. No. 17 at 2. Dr. Wang's declaration confirms that Petitioner had seven medical appointments for his GI concerns between July 24, 2025, and October 11, 2025. Dkt. No. 23 (Second Wang Decl.) ¶ 7. At these appointments, Petitioner was provided with laxatives, stool softeners, anti-diarrheal medication, and fiber supplements. *Id.* When Petitioner's labs did not identify the cause of the problem, he was told that he was "healthy" and needed to watch his diet. Dkt. No. 17 at 2.

Despite Petitioner's repeated requests, IHSC staff refused to send him for emergency care. Dkt. No. 17 at 2. The providers' position, as expressed to Petitioner and as reiterated in the declarations of Dr. Wang, was that Petitioner needed to wait for an appointment with a gastrointestinal ("GI") specialist. Dkt. No. 17 at 2; Dkt. No. 23 ¶ 10. On August 28, 2025, over a month after Petitioner began complaining about GI symptoms including blood in his stool, IHSC placed a referral to their contracted GI specialist. Dkt. No. 13 (First Wang Decl.) ¶ 12. Petitioner was scheduled for the specialist's first available appointment, on November 12, 2025. *Id.*

On or about October 16, 2025, Petitioner's abdominal pain became unbearable. He recounts:

> I was in extreme pain and could barely walk. I began yelling and crying, begging to be taken to medical. I sat at a table crying for about three hours before a Lieutenant finally came and ordered that I be taken to medical.
>
> Even though I could hardly walk, I was forced to walk down the stairs to get there; no wheelchair or stretcher was offered. When I

---

[3] The Court has not been provided with any IHSC records, only with Dr. Wang's declarations, which include his summaries of some of Petitioner's ICS visits. *See generally* Dkt. Nos. 13, 23. The selective nature of Dr. Wang's summaries is troubling. For example, his first declaration indicates that Petitioner reported blood in his stool during his visits on July 24, 2025, and August 14, 2025. Dkt. No. 13 ¶ 7. In his second declaration, Dr. Wang has removed all references to Petitioner's complaints of blood in his stool, including from summaries of these same appointments. *See* Dkt. No. 23 ¶ 7.

> arrived, the nurse told me to go back to my unit and take
> ibuprofen. I insisted that I needed to go to the hospital. After
> another three-hour wait, the provider agreed to send [me] to the
> hospital.

Dkt. No. 17 at 2. A CT scan showed colitis (inflammation) in Petitioner's descending and

sigmoid colon. Dkt. No. 16 (hospital records) at 40. Petitioner was prescribed Augmentin, an

antibiotic, and instructed to follow up with a GI specialist. *Id.* Upon return to the NWIPC,

Petitioner attempted to fill his prescription but was refused the antibiotics. Dkt. No. 17 at 3; Dkt.

No. 23 ¶ 12.[4] IHSC staff apparently believed, and Dr. Wang continues to believe at the time of

his declarations, that Petitioner had been diagnosed with "inflammatory bowel syndromes (IBS)

class of diagnosis."[5] *See* Dkt. No. 23 ¶ 11; *see also id.* ¶ 12 ("In response to claims regarding

delay of antibiotics for IBS, Petitioner had a negative stool culture . . . "). At some point, IHSC

providers treated Petitioner with Dicyclomine, an IBS medication. Dkt. No. 13 ¶ 15. Nothing in

the medical documents or other records submitted to the Court, except Dr. Wang's declaration,

indicates that Petitioner has been diagnosed with IBS or that IBS medications are appropriate for

his care.

     Petitioner reports that, at this first hospital visit, Doctors told him that due to "the delays

and lack of early treatment, my condition could progress into colon cancer, and that the situation

---

[4] In his first declaration, executed under penalty of perjury, Dr. Wang stated that "medical records suggest that Petitioner has been provided his prescribed medication" but "[t]here was a 2-day delay of diarrheal antibiotics following his October 17, 2025, ER return visit due to administrative issues on weekends." Dkt. No. 13 ¶ 16. In his second declaration, Dr. Wang corrected his prior statement and stated that the prescription was withheld upon a medical determination that antibiotics were unnecessary based on Petitioner's negative stool culture. Dkt. No. 23 ¶¶ 12, 18. Dr. Wang did not provide an explanation for the mistake.

[5] IBS is *irritable* bowel syndrome, not *inflammatory* bowel syndrome. IBD and IBS are distinct ailments. *See* supra n.2. IBS is "a common condition that affects the stomach and intestines" and produces symptoms such as "cramping, belly pain, bloating, gas, and diarrhea or constipation, or both," but rarely causes severe symptoms. "IBS doesn't cause changes in bowel tissue or increase risk of colorectal cancer." *Irritable Bowel Syndrome*, Mayo Clinic (October 11, 2024), https://www.mayoclinic.org/diseases-conditions/irritable-bowel-syndrome /symptoms-causes/syc-20360016 [https://perma.cc/X9PS-6UH3]. Unlike IBD, IBS is not associated with inflammation, does not cause rectal bleeding, and cannot be seen on any tests. *Inflammatory Bowel Disease (IBD): How is IBD different from Irritable Bowel Syndrome?*, American College of Gastroenterology (July 2024), https://gi.org/topics/inflammatory-bowel-disease/ [https://perma.cc/WTH2-89FH].

could have been prevented or made less severe if I had been treated sooner," and that "the medications NWIPC gave me actually worsened my condition." Dkt. No. 17 at 2. The hospital records provided to the Court do not include these opinions, which Dr. Wang disputes. However, Petitioner has provided declarations from physicians including Dr. Genevieve Pagalilauan, a physician and clinician-teacher who regularly treats patients with complex inflammatory bowel disease in collaboration with GI specialists. Dkt. No. 20 ¶ 4. Upon examining Petitioner, reviewing his charts, and consulting the American College of Gastroenterology guidelines for the care of people with ulcerative colitis, Dr. Pagalilauan concludes:

> The prolonged period of months during which he experienced ongoing abdominal pain, liquid stools and rectal bleeding without Gastroenterology evaluation and recommended treatment represents a failure of care compared to usual practice standards. His condition deteriorated to an unnecessarily emergent state due to withholding hospital-level evaluation or treatment in a timely fashion to appropriately address escalating symptoms.

*Id.* ¶ 9; *see also* Dkt. No. 20-1 (Whitehill Decl.) ¶¶ 7–8.

## 2. Bone Infection and Amputations

On October 20, 2025, Petitioner reported to IHSC with pain and swelling in his foot. Dkt. No. 23 ¶ 13; Dkt. No. 17 at 3. According to Dr. Wang, Petitioner was immediately started on antibiotics. Dkt. No. 23 ¶ 13 According to Petitioner, he was denied a request to go to the hospital and told to come back only if his foot worsened. Dkt. No. 17 at 3. Petitioner reports, and Respondents do not deny, that his foot did worsen, but when he went to sick call, "the nurse did not call [him] in" to be seen. *Id.* The next time Petitioner came back, on October 22, 2025, he was eventually sent back to the emergency room. Dkt. No. 23 ¶ 13. However, Petitioner reports, and Respondents do not deny, that he was only hospitalized after refusing providers' initial attempt "to send [him] back to [his] housing unit." Dkt. No. 17 at 3.

At the hospital, it was determined that Petitioner's pain and swelling were caused by toe osteomyelitis (a bone infection). Dkt. No. 16 at 1; Dkt. No. 17 at 3. His course of treatment was complicated by worsening GI symptoms, and testing led to a diagnosis of ulcerative colitis. Dkt. No. 17 at 2. Petitioner underwent a surgical debridement and two separate amputation surgeries to remove infected bone. Dkt. No. 13 ¶ 13; Dkt. No. 16 at 3.

Petitioner spent 22 days in the hospital. Dkt. No. 17 at 3. While there, he experienced an episode of tachycardia (heart palpitations), reported possible neuropathy in his hand, and was diagnosed with a kidney injury, acute blood-loss anemia, and a severe vitamin D deficiency. Dkt. No. 16 at 3. His medical records from the stay note that he "resides at ICE detention facility and has had difficulty obtaining care" (*id.* at 40).

In Dr. Pagalilauan's opinion,

> [T]he osteomyelitis necessitating toe and partial foot amputation was more likely than not a complication of inadequately treated ulcerative colitis.
>
> There is no documentation, nor verbal report from Mr. Sorio of antecedent trauma, skin breakdown, or local wound to the affected foot that would otherwise account for the development of a bone infection. Instead, following several months of uncontrolled ulcerative colitis and the absence of adequate medical treatment, the patient developed spontaneous swelling of the right fifth toe and required hospitalization.
>
> In my medical opinion, the medical records and history are concerning for hematogenous bacterial spread originating from the described deep ulcerations of the sigmoid and descending colon described in the colonoscopy report, leading to infection of the right fifth toe and ultimately necessitating amputation. [6]

Dkt. No. 20 ¶¶ 10–12; *see also* Dkt. No. 21-1 ¶ 9 ("In my medical opinion, Mr. Sorio's bone

---

[6] Dr. Wang responds to Dr. Pagalilauan as follows:

> Dr. Pagalilauan questioned whether Petitioner's IBS led to his osteomyelitis. There are some associations of this in the pediatric/adolescence population; Chronic nonbacterial 20 osteomyelitis (CNO), also known as chronic recurrent

infection and subsequent toe amputation are consistent with a significantly compromised immune state at the time the infection developed.").

Petitioner reports that he lost 41 pounds in ICE detention between March 2025 and October 2025, dropping from 183 pounds to 142 pounds because his gastrointestinal issues caused ongoing blood loss and made him unable to eat, resulting in malnutrition. Dkt. No. 17 at 4. Hospital records report a 30-pound weight loss. Dkt. No. 17 at 2. According to Dr. Wang, Petitioner had lost only 16.6 pound in ICE detention as of November 26, 2025. Dkt. No. 23 ¶ 15. Dr. Wang does not dispute that Petitioner's weight loss is the unwanted result of malnutrition and blood loss, but asserts "[a]t 153.4lbs, Petitioner's BMI is at mild obesity range of 24.39. A healthier range will be 20-23 BMI."[7]

### 3.    Post-Operative Care

Petitioner returned to NWIPC on November 12, 2025. Dkt. No. 17 at 3. The next day, when ICSH staff attempted to dress his amputation wound, he alleges they dressed it improperly and he "had to explain to staff how to properly dress it." *Id.* At that time Petitioner required a wheelchair or crutches due to his recent amputations and requested that his medications be brought to him so he did not have to go upstairs to retrieve them. *Id.* This request was refused. *Id.*

---

multifocal osteomyelitis (CRMO), is a rare autoinflammatory disease primarily affecting children and adolescents. This would point to a nonbacterial etiology where treatment is immunosuppressant. However, in Petitioner's case, per the podiatry note from the hospital, Petitioner's toe was cellulitic, infectious, with purulent 24 discharge. This is not seen in CNO. Again, etiology of his toe infection remains a mystery.

Dkt. No. 23 ¶ 16. The Court does not find this response credible. First, Dr. Wang continues to confuse inflammatory bowel disease (IBD) with irritable bowel syndrome (IBS), even in characterizing Dr. Pagalilauan's medical opinion. Dr. Pagalilauan does not opine on "whether Petitioner's IBS led to his osteomyelitis," and there is no indication in the record that Petitioner has an IBS diagnosis. Second, Dr. Wang does not indicate the sources he relied on for this very specific knowledge about a rare autoimmune disease mainly seen in children. Third, Dr. Wang's conclusion that Petitioner was unlikely to have chronic nonbacterial osteomyelitis is not responsive to Dr. Pagalilauan's actual opinion regarding "hematogenous bacterial spread."

[7] *Id.* Petitioner is 67 inches, or five feet seven inches. Dkt. No. 1-7 at 2.

On November 17, 2025, Petitioner was returned to the emergency room but was not admitted for inpatient care. *Id.* He continued to feel weak and pass blood. *Id.*

On November 19, 2025, NWIPC medical staff removed Petitioner's amputation stitches. *Id.* Petitioner reports that the removal of twelve stitches took two hours, and six of the twelve stitches were stuck, causing extreme pain. *Id.* Petitioner alleges that his wound was not healed and was still oozing liquid at the time the stitches were healed. *Id.* Petitioner also alleges he was "denied medical tape and gauze" to protect the resulting open wound while showering. Dkt. No. 2 at 4. However, Dr. Wang reports that wound care has been appropriate and that a follow-up appointment with a podiatrist confirmed that the amputation wound is healing well, despite Petitioner's "abnormal belief" that he should not clean the wound with soap and water. Dkt. No. 23 ¶¶ 14, 17.

Petitioner attended a visit with a gastrointestinal specialist on November 26, 2025. Dkt. No. 17 at 4. He learned at that visit that ulcerative colitis is a lifelong condition, and that insufficient treatment could lead to colon cancer. *Id.*

Since the November 26 visit, Petitioner asserts that his health has rapidly worsened, with multiple episodes of "severe difficulty breathing accompanied by what feels like a heart attack." *Id.* He has been unable to lie down and must sleep sitting up.[8] He has also developed "a new pruritic rash that is continuing to spread across his face and upper body." Dkt. No. 20 ¶ 13. Dr. Wang reports that IHSC has determined that Petitioner is fit to travel. Dkt. No. 23 ¶ 6. Respondents contend, therefore, that his removal order can safely be executed immediately. Dkt. No. 22 at 6.

---

[8] Dr. Wang states that Petitioner had an EKG (electrocardiogram) while at NWIPC on October 20, 2025, and a cardiac ECHO while hospitalized on November 8, 2025. Dkt. No. 13 ¶ 12. Dr. Wang describes the results of both tests as "normal." *Id.*

**B.      Removal Order and Request for Administrative Stay of Removal**

On October 2, 2025, before Petitioner received any outside treatment for his gastrointestinal symptoms, his removal hearing was held. Petitioner's applications for Cancellation of Removal and Withholding of Removal were denied, and he was ordered removed. Dkt. No 1-7 (Order of the Immigration Judge) at 2–4. Petitioner waived his right to appeal, and the removal order became final. *Id.* at 5.

On November 26, 2025, Petitioner filed an application for a Stay of Removal based on exceptional medical need. Dkt. No. 1-1. An administrative stay of removal, which is different from a judicial stay of removal, is a discretionary process by which certain enumerated DHS employees "in consideration of factors listed in 8 CFR 212.5 and section 241(c) of the [Immigration and Nationality] Act, may grant a stay of removal or deportation for such time and under such conditions as he or she may deem appropriate." 8 C.F.R. § 241.6(a).

A person under a final order of removal is entitled to seek an administrative stay of removal. § 1241.6(a). However, no appeal is available for a denied request.

On December 3, 2025, Seattle ERO officers received an email from a representative of the Philippine Consulate expressing concern that Petitioner be able to recover before his removal and requesting that his travel documents not be finalized until after his stay of removal request was adjudicated. Dkt. No. 14 (Melendez Diaz Decl.) at 10–11 (Consulate–ERO correspondence).

On December 6, 2025, ICE denied the Stay of Removal request. Dkt. No. 1-2. Petitioner was issued a denial letter informing him that "[a]n administrative stay of removal may only be granted as a matter of discretion to an alien in accordance with 8 CFR §241.6 and in consideration of factors enumerated in INA §241(a)(2) and 8 CFR §212.5 . . . in cases of 'urgent humanitarian reasons' or 'significant public benefit,' terms which are narrowly defined as," among other circumstances, "serious medical conditions . . . ." *Id.* at 1. According to the letter,

Petitioner's request was denied upon a finding that "the totality of the circumstances do not support a favorable exercise of discretion" because "the emotional and financial hardships associated with this case . . . do not rise to the level of 'exceptional' when compared to other persons similarly situated and facing removal from the U.S." *Id.* at 2. However, Petitioner's application for a stay of removal had raised only medical concerns, not any "emotional of financial" grounds for staying his removal. *See generally* Dkt. No. 1-1. The same day, Supervisory Detention and Deportation Officer Brett T. Booth emailed the Philippine Consulate, informing them, "Ice Health Services Corps (IHSC) has assessed Mr. Sorio and determined that he is medically cleared to travel. ERO has therefore denied the I-246 request and plan to remove him tomorrow . . . . ICE has requested wheelchair assistance through the airline as he is not mobile over long distances due to the amputation." Dkt. No. 14 at 9–10.

The next day, December 7, 2025, ICE attempted to deport Petitioner; however, Philippine Airlines refused to allow Petitioner to board the flight due to his medical condition. Dkt. No. 1-11 (Carhart Decl.) ¶¶ 4–7. The Philippine Consulate subsequently informed ERO of certain requirements set by the Philippines airline physician for medical clearance. Dkt. No. 14 at 7. ICE informed Petitioner's counsel on December 8, 2025, that Petitioner would be "deported as soon as possible." *Id.* ¶ 8.

## II.    LEGAL STANDARD

"Writs of habeas corpus may be granted by . . . the district courts . . . within their respective jurisdictions." 28 U.S.C. § 2241(a). Habeas petitioners must prove by a preponderance of the evidence that they are entitled to relief, *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)—that is, that they are "in custody in violation of the Constitution or laws or treaties of the United States," 8 U.S.C. § 2241(c).

### III.    DISCUSSION

Petitioner alleges that his continued detention violates the Fifth Amendment to the United States Constitution, which prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law[.]" Petitioner asks the Court to find that his detention violates due process on three grounds: (1) that he was deprived of procedural due process in the handling of his request for an administrative stay of removal (*id.* ¶¶ 51–61, 81–82); (2) that Respondents have subjected him to unconstitutionally punitive conditions during his detention (*id.* ¶¶ 17–78); and (3) that his treatment by Respondents has deprived him of his substantive due process right to bodily autonomy (*id.* ¶¶ 62–70). The Court addresses these claims in turn, considering where necessary whether it properly has jurisdiction over the claim in habeas.

### A.    Petitioner Has Not Established a Procedural Due Process Violation

Respondents assert Petitioner's first ground for relief is beyond the Court's jurisdiction because it is not actually a procedural due process claim, but a "direct[] attack[ on] ICE's discretionary denial of his stay request, including the sufficiency of ICE's consideration." Dkt. No. 22 at 12.

The Court disagrees. Based on the plain language of Petitioner's complaint, he does not challenge the denial of his request for a stay of removal in the first instance, and he does not ask the Court to substitute its discretion for DHS's. Rather, he challenges as unconstitutional the fact that he had no appeal process for his stay of removal request. Because 8 C.F.R § 241.6 specifically provides that "[d]enial . . . of a request for a stay is not appealable," the Court construes this as a challenge to the constitutionality of the regulation. Although 8 U.S.C. § 1252 precludes this Court's review of ICE's decision to execute Plaintiff's removal order, federal district courts have jurisdiction to hear "general collateral challenges to unconstitutional

1    practices and policies used by the agency." *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1118 (9th

2    Cir. 2001) (citation modified). Therefore, the Court has jurisdiction to hear Petitioner's

3    procedural due process claim.

4          Petitioner's procedural due process claim challenges the process afforded to Petitioner in

5    the handling of his request for an administrative stay of removal. Specifically, Petitioner alleges

6    that he was deprived of due process because (a) his request was denied with no opportunity for

7    appeal, and (b) he was deprived of an opportunity to be heard and to "present evidence of

8    medical opinions from non-ICE medical professionals." Dkt. No. 1. ¶¶ 81–82.

9          "Procedural due process imposes constraints on governmental decisions which deprive

10   individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of

11   the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "The

12   fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and

13   in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

14         In *Mathews*, the Supreme Court established the three-part balancing test that has become

15   "[t]he ordinary mechanism that we use for balancing" the "autonomy that the Government

16   asserts is necessary in order to pursue effectively a particular goal and the process that a citizen

17   contends he is due *before he is deprived of a constitutional right*." *Hamdi v. Rumsfeld*, 542 U.S.

18   507, 528–29 (2005) (emphasis added).[9] While Petitioner conducts a cursory *Mathews* analysis in

19   his petition (Dkt. No. 1 ¶¶ 51–61)—before essentially abandoning this claim in his subsequent

20   briefing—(*see generally* Dkt. Nos. 19 (reply in support of motion for TRO), 24)—the analysis is

21   muddled and misconstrues the right, interests, and deprivation at issue. While Petitioner asserts

---

22   [9] While not well suited to the facts here, the *Mathews* test is widely applied by district courts in this Circuit in
     adjudicating challenges to the manner in which a noncitizen has been detained or re-detained. *See, e.g.*, *Torres v.*
23   *Hermosillo*, No. C25-2687, 2026 WL 145715, at *6 (W.D. Wash. Jan. 20, 2026); *Sira-Hurtado v. Hermosillo*,
     No. C25-2173, 2025 WL 3294986, at *2 (W.D. Wash. Nov. 26, 2025); *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1033
24   (N.D. Cal. 2025); *see also Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206–07 (9th Cir. 2022) (assuming without
     deciding that the *Mathews* test applies in "the immigration detention context").

he has a "protected interest in his liberty," he was deprived of his liberty not when he was denied

an opportunity to appeal the denial of his request for an administrative stay of removal (which,

even if granted, would not have guaranteed release, *see* 8 C.F.R. § 241.6(a)), but when he was

originally detained by ICE in March 2025. There does not appear to be any allegation that *that*

deprivation was unlawful. While Petitioner says he was "was deprived of his procedural due

process rights," this is not itself a cognizable deprivation, and Petitioner does not have a

constitutionally protected interest in a particular administrative appeals process not provided by

statute or regulation.[10] It is also unclear why Petitioner "was not able to present evidence of

medical opinions from non-ICE medical professionals" as part of his initial request for a stay of

removal.

       In sum, Petitioner fails to demonstrate that his inability to appeal the denial of his stay of

removal request violated any procedural due process right protected by the Constitution.

**B.    Petitioner Has Shown His Detention Is Unconstitutionally Punitive**

       Respondents allege that Petitioner's second and third grounds for relief, by relying on

arguments related to his medical treatment while in Respondents' custody, are "conditions of

confinement" claims not properly brought in habeas. Dkt. No. 22 at 13. Respondents rely heavily

on *Pinson v. Carvajal*, a Ninth Circuit decision that rejected habeas as a vehicle for an Eighth

Amendment challenge brought by individuals in prison pursuant to criminal convictions. *See*

Dkt. No. 22 at 13–15 (citing *Pinson v. Carvajal*, 69 F.4th 1059, 1069, 1072–73 (9th Cir. 2023),

---

[10] This is not to say that Petitioner does not have an interest in Respondents complying with their own agencies' regulations. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (agency's "failure to exercise its own discretion, contrary to existing valid regulations" is violation of law sufficient to support a habeas claim) In the Ninth Circuit, *Accardi* claims are properly brought under the APA. *See Carnation Co. v. Sec'y of Lab.*, 641 F.2d 801, 804 (9th Cir. 1981) (noting that "[t]he *Accardi* doctrine is not a constitutional one"); *See Brown v. Haaland*, No. C21-344, 2023 WL 5004358, at *4 (D. Nev. Mar. 6, 2023) (holding that an *Accardi* claim is distinct from a constitutional due process claim," but "may proceed under the APA") Here, USCIS's letter informing petitioner of the denial of his stay of removal raises concerns that USCIS did not comply with the 8 C.F.R. § 241.6's requirement that stays of removal be evaluated "in consideration of factors listed in 8 CFR 212.5 and section 241(c) of the Act." But Petitioner did not bring an APA claim.

1   *cert. denied sub nom. Sands v. Bradley*, 144 S. Ct. 1382 (2024)). Respondents acknowledge,

2   however, that "the Supreme Court has left open the question of whether there are circumstances

3   when a challenge to the conditions of confinement is properly brought in a habeas petition . . . ."

4   Dkt. No. 22 at 15 (citing *Ziglar v. Abbasi*, 582 U.S. 120, 144–45 (2017)).

5          The Court does not reach Petitioner's substantive due process claim for violation of his

6   right to bodily autonomy, and therefore need not consider whether the "circumstances" of that

7   claim are of the kind imagined by the *Ziglar* court. Whether civil detention is unconstitutionally

8   punitive, however, is a question that clearly sounds in habeas because it goes directly to the

9   legality of the detention itself. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("[G]overnment

10  detention violates [the Due Process] Clause unless the detention is ordered in a *criminal*

11  proceeding with adequate procedural protections, or, in certain special and 'narrow' nonpunitive

12  'circumstances,' where a special justification, such as harm-threatening mental illness, outweighs

13  the 'individual's constitutionally protected interest in avoiding physical restraint.'" (internal

14  citations omitted)). Because a person in punitive civil detention is therefore "in custody in

15  violation of the Constitution or laws or treaties of the United States," 8 U.S.C. § 2241(c)(3), a

16  petition seeking release from the unlawful detention sounds squarely in habeas. "For civil

17  detainees like [Petitioner], the Ninth Circuit has held that conditions of confinement are a

18  relevant factor in determining whether civil detention remains civil rather than punitive (and

19  therefore permissible)." *Doe v. Becerra*, 723 F. Supp. 3d 688, 691 n.1 (N.D. Cal. 2024)

20  (rejecting government's argument under *Pinson* that punitive-detention claim did not sound in

21  habeas). Therefore, the Court has jurisdiction in habeas over Petitioner's claim that his detention

22  is punitive.

23         "The Supreme Court held more than a century ago that civil detention of a removeable

24  noncitizen violates the Constitution if it is punitive." *Doe v. Becerra*, 732 F. Supp. 3d 1071, 1078

1    (N.D. Cal. 2024) (citing *Wong Wing v. United States*, 163 U.S. 228, 237–38 (1896)). Before

2    punishment can be imposed, the Fifth and Sixth Amendments to the United States Constitution

3    together require the opportunity for trial by jury with specific procedural protections. *See Wong*

4    *Wing*, 163 U.S. at 233–34. Civil detainees, even noncitizens with final orders of removal, have

5    not been afforded a trial or any of the attendant procedural safeguards. *See id.*

6            The Parties appear to agree that the appropriate test of whether a restriction is punitive is

7    provided in *Jones v. Blanas*, 393 F.3d 918, 933–34 (9th Cir. 2004)), a case that arose from a

8    challenge to civil detention of a person awaiting adjudication regarding involuntary commitment

9    under California's Sexually Violent Predator Act. For the purposes of this case, therefore, the

10    Court will assume, as the Parties do, that *Jones* controls the determination of whether Petitioner's

11    detention is punitive in nature. However, each Party cites a different passage of *Jones* to guide

12    the Court's analysis. Respondents rely on the statement that "[a] restriction is punitive where it is

13    intended to punish, or where it is excessive in relation to its non-punitive purpose." Dkt. No. 22

14    at 19 (citation modified) (quoting *Jones*, 393 F.3d at 933–34). Petitioner suggests the Court use

15    the two-part test created by the *Jones* court, which begins with a rebuttable presumption that a

16    civil detainee is "being subjected to 'punishment'" if their conditions of confinement are

17    "identical to, similar to, or more restrictive than, those in which . . . criminal counterparts are

18    held[.]" 393 F.3d at 932; *see* Dkt. No. 19 at 9–10; Dkt. No. 24 at 9. To rebut this presumption,

19    the government must explain "what legitimate, non-punitive purpose justified" the conditions.

20    *Jones*, 393 F.3d at 934; *see also King v. County of Los Angeles*, 885 F.3d 548, 557 (9th Cir.

21    2018) (applying the two-step test from *Jones*). The government cannot carry its burden "based

22    solely on [a] generalized statutory requirement" if the person's detention appears "excessive in

23    relation to this purpose" and the purpose "could have been carried out via alternative and less

24    harsh methods." *Jones*, 393 F.3d at 934 (citation modified). Essentially, this two-step test offers

another way to get at the same question as Respondents pose it: i.e., whether conditions are "intended to punish" or are "excessive in relation" to a legitimate non-punitive purpose.

For two reasons, and only for the purposes of this Petition, the Court adopts the language suggested by Respondents as the standard. First, Petitioner did not raise the two-part *Jones* test in his Petition, and Respondents did not address it in their Response. While Respondents were on notice of Petitioner's *Jones* arguments because Petitioner included them in his briefing in support of a motion for temporary restraining order (*see* Dkt. No. 19 at 9–10), the Court finds it is sounder practice to apply a standard that was raised in the briefing on *this* motion, at an earlier posture than the filing of Petitioner's reply. Second, there is no evidence in the record about conditions of criminal detention by which the Court can determine whether *Jones*'s rebuttable presumption applies. The urgency of this matter counsels adopting Respondents' chosen standard rather than requiring the parties to submit additional evidence.

The question, then, is whether the conditions of Petitioner's detention, specifically his medical care or denial of medical care, were intended to punish him, or were excessive in relation to a legitimate non-punitive purpose served by his detention.

As to the first question, the Court agrees with Respondents that "Petitioner has not demonstrated that IHSC's medical treatment constitutes an express intent to punish him." Dkt. No. 22 at 19. Little evidence supports a subjective intent to punish Petitioner, and he has not argued that this was the intent of Respondents or their agents in creating the conditions at issue.

In addressing the second prong of the standard, however, Respondents veer away from defending the conditions of IHCS's medical treatment and limit their argument to the fact and length of Petitioner's detention: "Petitioner's continued immigration detention after he has been subject to a final order of removal, and is still within the INA's removal period, cannot be described as punitive or excessive in relation to the legitimate governmental purpose of

protecting the public and enforcing U.S. immigration laws." *Id.* at 20. This limited argument misses the mark. "[B]oth the duration of detention *and* the conditions of the individual's confinement" are relevant to a determination of whether the restriction is excessive. *Doe v. Becerra*, 732 F. Supp. 3d at 1078 (emphasis added). This has been true since the very establishment of the prohibition on punitive civil detention, in *Wong Wing*, 163 U.S. 228. In that case (which arose in habeas), the Supreme Court found that "'imprison[ment] at hard labor" for up to a year before removal—a condition imposed only on noncitizens of Chinese descent—was a condition that could "only be inflicted upon a person after his due conviction of crime, pursuant to the forms and provisions of law." *Id.* at 241. By arguing merely that the *fact* and *length* of Petitioner's detention are not excessive in relation to a legitimate government purpose, Respondents miss the moment of Petitioner's claim: that it is the conditions and ancillary deprivations he is being subjected to, by virtue of the nature of the medical treatment provided to him, that renders his detention unconstitutional.[11]

While Respondents largely do not address the conditions of Petitioner's confinement in responding to this claim, they argue elsewhere that "the medical care [Petitioner] has received is constitutionally adequate." Dkt. No. 22 at 15. But the record here compels a finding that, on the preponderance of the evidence, Petitioner's medical care, and denial of medical care, included objectively unreasonable failures of care that more likely than not resulted in permanent disability, including the loss of his toe and part of his foot. The Court bases this finding on the following facts:

- It is undisputed that Respondents waited more than a month after Petitioner began complaining of blood in his stool to refer him to a GI specialist, despite repeated

---

[11] The Court agrees that the length of Petitioner's detention does not render it punitive. At the time of filing the instant petition, Petitioner was within the 90-day "removal period" after issuance of a final order of removal, and he remains in the "presumptively reasonable" sixth-month period now. *See Zadvydas*, 533 U.S. at 701 (2001).

complaints about rectal bleeding, and despite Dr. Wang's statement that specialist testing was required for a diagnosis.

- It is undisputed that Respondents denied Petitioner's repeated requests to be taken to the hospital during that time.

- It is undisputed that, at the peak of Petitioner's abdominal pain, NWIPC staff ignored his screams and cries of pain for three hours before a Lieutenant arrived and ordered he be taken to medical. It is undisputed that staff forced him to walk down stairs when he "could hardly walk," that a nurse tried to send him away with ibuprofen, and that he waited another three hours before providers agreed to send him to the hospital.

- According to Respondents' own declarant Dr. Wang, after a hospital physician prescribed antibiotics to Petitioner after diagnostic imaging revealed colitis in his bowel, ICSH staff determined that antibiotics were unnecessary and refused to fill his prescription.

- According to Petitioner's declarant Dr. Pagliluaun, and not meaningfully disputed by Respondents or by Dr. Wang, when ulcerative colitis that involves "deep ulcerations of the sigmoid and descending colon [as] described in [Petitioner's] colonoscopy report" is insufficiently treated, "hematogenous bacterial spread" can result in infection elsewhere in the body.

- It is undisputed that, three days after Petitioner was denied the antibiotics that were prescribed to him, he returned to IHSC seeking treatment for the bone infection that would cost him part of his foot.

- It is undisputed that Petitioner was prescribed antibiotics and told to return to IHSC if his foot did not improve, but that when he first returned he was not seen.

- It is undisputed that, when Petitioner was finally taken to the hospital, it was already too late to save his infected toe. And, according to Petitioner's undisputed testimony, providers would have waited even longer to provide the necessary treatment if he had not refused to be sent away for a third time.

- In support of their claims that Petitioner received and is receiving adequate care at NWIPC, Respondents have provided no evidence other than the declarations of Dr. Wang.

- Dr. Wang believes Petitioner has been diagnosed with "IBS," and reports that IHSC providers under his direction are treating Petitioner with Dicyclomine, an IBS medication.

- Petitioner has been diagnosed with ulcerative colitis (a type of IBS), and no medical record or other evidence presented to the Court indicates an additional diagnosis of IBS.

- Multiple physicians have provided declarations opining that Petitioner's gastrointestinal symptoms required earlier escalation of treatment and the delay in appropriate treatment worsened his ulcerative colitis and likely led to his amputations *See generally* Dkt. Nos. 20, 20-1.

On their own, many of these facts would not be enough to show restrictions or conditions that are excessive in relation to the government's legitimate interest in executing removal orders, and in administering a detention facility in order to do so. Medical professionals in detention settings must exercise their judgment, which will sometimes reasonably mean denying a patient's request for hospitalization or withholding specific treatments. The Court is also cautious about the risks of judging these decisions only in hindsight, and without the context in which these providers must work. *See Bell v. Wolfish*, 441 U.S. 520, 562 (1979) ("The wide range of 'judgment calls' that meet constitutional and statutory requirements [for federal detention] are confided to officials outside of the Judicial Branch of Government."). Taken all together, however, these facts show a pattern of failures of care by Petitioner's custodians and medical providers that more likely than not resulted in the extreme pain and permanent disability Petitioner has suffered in Respondents' care.

The Court is particularly troubled by Dr. Wang's failure to distinguish between inflammatory bowel disease ("IBD") and irritable bowel syndrome ("IBS"), including his statement that Petitioner was given "Inflammatory Bowel Syndrome treatment, Dicyclomine," as evidence that "IHSC has been very attentive to [Petitioner's] condition of diarrhea[.]" Dkt. No. 13 ¶ 15. The record shows that Petitioner has been diagnosed with ulcerative colitis (a type of IBD), not with IBS. That IHSC has given Petitioner IBS medication is consistent with Petitioner's statement that he was told at the hospital that his medications at NWIPC may have done more harm than good.

In *Johnson v. Hannula*, No. C14-155, 2016 WL 527097, at *1 (W.D. Wis. Feb. 9, 2016), the Western District of Wisconsin considered whether a criminal detainee's medical treatment constituted deliberate indifference when prison medical personnel failed to diagnose him with ulcerative colitis and instead treated him for constipation in accordance with a diagnosis of probable IBS. *See id.* at *8. There was no dispute that the distinction is significant:

> Ulcerative colitis is a chronic inflammatory bowel disease characterized by inflammation and ulcerations of the mucosal lining of the large intestine, with cycles of remission and relapse. Symptoms of ulcerative colitis include pain and cramping in the abdomen; gurgling or splashing sounds heard over the intestine; blood and pus in stools, often multiple times a day; fever; feeling a need to pass stools, even though the bowels are empty; and weight loss. Constipation is not a common symptom of ulcerative colitis. . . .

> Irritable bowel syndrome is associated with abdominal pain, gas and alternating constipation and diarrhea, and sometimes mucous in stools. It is not an inflammatory bowel disease and is not usually associated with bloody stools. Irritable bowel syndrome is diagnosed based on a patient's symptoms and not a particular test.

*Id.* at *1–2. Ultimately, the *Johnson* court granted summary judgment for the defendants, finding that no reasonable jury could find the providers' care was "'blatantly inappropriate' or showed complete lack of medical judgment," in part because it was undisputed that the plaintiff's medical history and reported symptoms, which included frequent constipation and only occasional bloody stool, were consistent with his initial diagnosis of IBS and hemorrhoids, and that his treatment was consistent with that diagnosis. *Id.* at *9–10.

Despite the result in *Johnson*—which applied a deliberate indifference standard not applicable here—its logic confirms that the distinction between IBS and IBD is medically significant, and that indiscriminately treating *a confirmed diagnosis* of ulcerative colitis as though it were IBS would, in fact, show a serious failure of medical care. This unreasonable care is not limited to the past actions of Respondents and their agents: Because Petitioner will need

1    ongoing treatment for his ulcerative colitis in addition to his other medical issues, this

2    misunderstanding puts Petitioner at continued danger of further deprivations of his health and

3    bodily integrity, without due process of law. The fact that Petitioner continues to receive care

4    from outside contractors does not sufficiently mitigate this threat, as the denial of Petitioner's

5    prescription after his first hospital stay demonstrates that IHSC providers will substitute their

6    own judgment for the orders of Petitioner's outside providers.

7          Respondents have made no showing that the extreme restrictions on Petitioner's liberty

8    and health created by his custodians' decisions, ineptitude, and denial of care are not excessive in

9    relation to its asserted purpose of "protecting the public and enforcing U.S. immigration laws."

10   There is no indication that these interests could not have been just as easily served without

11   ignoring his cries of pain for hours, or without declining to see him as his bone was eaten away

12   by infection. There is no indication that these interests could not have been served while bringing

13   Petitioner to the hospital for imaging when a GI appointment could not be scheduled quickly (or

14   contracting with additional external providers), while filling his prescriptions, or while treating

15   him with appropriate medication based on his actual diagnosis. And finally, there is no indication

16   that these interests cannot be served by subjecting Petitioner to alternatives to detention under

17   appropriate conditions of release while he pursues outside treatment—an argument raised in the

18   habeas petition but completely ignored by Respondents. Dkt. No. 1 ¶ 61.

19         In sum, the length of Petitioner's detention does not support a finding that it is excessive

20   in relation to its purpose, but the conditions of his detention do. Under the unique facts of this

21   case, the extreme consequences of Respondents' unreasonable treatment of Petitioner constitute

22   deprivations so excessive that the conditions of detention alone take Respondents' detention of

23   Petitioner out of the realm of constitutional civil detention and render it punitive.

24

Because he is subject to punitive detention for which he has had no due process of law, the Court finds that Petitioner is in custody in violation of the Constitution of the United States and his immediate release is required.[12]

## IV.    CONCLUSION

Accordingly, the Court ORDERS as follows:

(1)     The Petition for a Writ of Habeas Corpus (Dkt. No. 1) is GRANTED.

(2)     Respondents SHALL release Petitioner from detention **no later than 5:00 p.m. on February 14, 2026**, under appropriate conditions of release;

(3)     Respondents and all their officers, agents, employees, attorneys, and persons acting on their behalf or in concert with them SHALL NOT re-detain Petitioner under conditions that amount to punishment. However, nothing in this Order prevents Respondents from re-detaining Petitioner in order to execute his removal order, subject to the limitations of Due Process and applicable law.

(4)     **No later than 12:00 noon on February 16, 2026**, Respondents SHALL provide the Court with a declaration confirming that Petitioner has been released from custody and informing the Court of the date and time of his release.

(5)     Any motion requesting fees should be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412.

Dated this 13th day of February, 2026.

Tana Lin
United States District Judge

---

[12] Because the Court finds that Petitioner's detention is impermissibly punitive in violation of the Due Process Clause, and thus affords relief on that basis, it does not reach Petitioner's substantive due process claim for violation of the right to bodily autonomy (or the threshold jurisdictional question raised by Defendants as to that claim).